ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IX

| OFICINA DE ÉTICA GUBERNAMENTAL<br><br>Parte Recurrida<br><br>V.<br><br>HÉCTOR JOAQUÍN SÁNCHEZ ÁLVAREZ<br><br>Parte Recurrente | TA2025RA00234 | Revisión Judicial procedente de la Oficina de Ética Gubernamental<br><br>Caso Número: 24-38<br><br>Sobre: Violación al Artículo 4.2, Inciso (b)y (s)de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, Ley 1-2012, Según Enmendada |

Panel integrado por su presidenta, la Juez Brignoni Mártir, el Juez Salgado Schwarz y la Juez Aldebol Mora.

Salgado Schwarz, Carlos G., Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico a 12 de noviembre de 2025.

Comparece el señor Héctor Joaquín Sánchez Álvarez ("Sr. Sánchez" o "Recurrente") y solicita que revoquemos la Resolución emitida el 11 de julio de 2025 por la Oficina de Ética Gubernamental ("OEG", "Agencia" o "Recurrida"). En esa ocasión, la Agencia le impuso al Recurrente una multa de $2,500.00 por cada una de las infracciones cometidas, para una multa total de $5,000.00.

Por los fundamentos que exponemos a continuación, *revocamos* la determinación emitida por la OEG.

-I-

El 23 de enero de 2024, la OEG presentó una *Querella*[1] contra el Sr. Sánchez. En esa ocasión, la

---

[1] Véase recurso de revisión judicial, Anejo 4.

Recurrida alegó que el Sr. Sánchez utilizó las facultades y deberes de su cargo como subsecretario del Departamento de Educación de Puerto Rico ("DEPR") para convocar a cuatro miembros del jurado durante el proceso de selección para el premio de Maestro del Año 2021-2022, a fin de obtener un beneficio no permitido por ley, a saber, una ventaja indebida a favor de dos participantes. El 5 de febrero de 2024, el Sr. Sánchez presentó su *Contestación a Querella*[2]. El Recurrente alegó que no fue parte del proceso. Además, indicó que el concurso se realizó conforme el Plan de Trabajo *"Elementary and Secundary School Emergency Program"* *(ESSER)* para la iniciativa *"Brilla la Comunidad Escolar"* y que no se presentó querella formal en el DEPR por los hechos alegados en el caso de epígrafe. Luego de varios incidentes procesales, el 19 de agosto de 2024, las partes presentaron el *Informe de Conferencia con Antelación a la Audiencia*[3]. Como parte del Informe, las partes estipularon doce (12) hechos y veintiocho (28) documentos. Así las cosas, los días 9 y 12 de diciembre de 2024 se llevó a cabo la Audiencia y se les concedió a las partes hasta el 24 de enero de 2025 para presentar sus respectivas argumentaciones en derecho[4].

Así las cosas, el 4 de febrero de 2025, el Recurrente presentó un *Memorando de Derecho*[5]. Como parte de sus alegaciones, el Sr. Sánchez señaló que a la controversia de autos le aplica la doctrina de cosa juzgada debido a que dos agencias, el Departamento de

---

[2] *Íd.*, Anejo 5.
[3] *Íd.*, Anejo 6.
[4] *Íd.*, Anejo 8.
[5] Véase expediente de Primera Instancia en el Sistema Unificado de Manejo y Administración de Casos (SUMAC), Entrada #13.

Justicia y la Oficina de la Fiscal Especial Independiente, pasaron juicio sobre los mismos hechos. El 11 de febrero de 2025, la OEG presentó una *Breve Réplica a Memorando de Derecho*[6]. En esa ocasión, la Agencia señaló que no aplica la doctrina de cosa juzgada debido a que el *quantum* de prueba entre las agencias es sustancialmente distinto. Además, alega que el proceso de selección del "Maestro del año 2021-2022" debió haber sido "*el resultado de un proceso competitivo y no de la imposición e instrucción del segundo en mando jerárquico en el Departamento de Educación instruyendo quién debía prevalecer*"[7]. El 14 de febrero de 2025, el Recurrente presentó una *Breve Réplica a Memorando de Derecho de la Querellante y Dúplica a su Réplica*[8]. En síntesis, alega que la OEG no cumplió con el *quantum* de prueba requerido ya que "*el estándar de prueba para imponer una multa sustancial es uno intermedio de prueba clara, robusta y convincente, que, a su vez, supere y descarte todos los planteamientos basados en conjeturas*"[9]. Mediante *Orden*[10] del 26 de febrero de 2025[11], la Oficial Examinadora notificó que el caso quedó sometido para adjudicación. Así las cosas, el 30 de junio de 2025, la OEG emitió el *Informe de la Oficial Examinadora*, en el cual se formularon las siguientes determinaciones de hechos:

1. El 20 de septiembre de 2018, el DEPR y la *Puerto Rico Education Foundation, Corp.* (PREF) suscribieron un *Memorandum of Understanding* para colaborar en el cumplimiento de la política pública de promulgar la excelencia en la calidad de enseñanza que se imparte en las escuelas del

---

[6] *Íd.*, Entrada #14.
[7] *Íd.*, págs. 6-7.
[8] *Íd.*, Entrada #15.
[9] *Íd.*, pág. 2.
[10] *Íd.*, Entrada #16.
[11] Notificada el 27 de febrero de 2025.

sistema educativo, establecida en la Ley Núm. 85-2018, según enmendada, *Ley de Reforma Educativa de Puerto Rico* (Ley 85-2018). Dichas partes suscribieron una enmienda al *Memorandum of Understanding* el 31 de enero de 2019.

2. *La Puerto Rico Education Initiative* (PREI), división de PREF, presentó al DEPR la iniciativa llamada "*Brilla la Comunidad Escolar*" para reconocer al maestro y director del año para el 2021-2022.

3. El querellado ocupó el puesto de subsecretario asociado del DEPR desde el 19 de enero de 2021 hasta el 30 de junio de 2022.

4. Las funciones del subsecretario asociado, bajo delegación expresa del secretario del DEPR, son:

   a. Colabora en la formulación e implantación de la política pública establecida por la agencia.

   b. Asiste al secretario de Educación en la planificación, coordinación, dirección, supervisión y evaluación de las actividades administrativas, programáticas, técnicas y operacionales.

   c. Asiste al secretario en la gerencia de los proyectos de la agencia.

   d. Analiza leyes, reglamentos, proyectos de ley, estudios o trabajos realizados por otros funcionarios, entidades del gobierno y por la Legislatura y somete recomendaciones sobre los mismos.

   e. Coordina, establece y mantiene comunicación continua con otras agencias del gobierno, organizaciones cívicas, culturales y empresariales de la isla y del exterior, así como con diversas instituciones de carácter internacional relacionadas con su trabajo.

   f. Desarrolla planes y proyecciones a corto y a mediano plazo y hace recomendaciones al secretario sobre la calidad, eficiencia y resultados esperados de las actividades.

   g. Desarrolla, establece y evalúa normas, sistemas y procedimientos pertinentes a las actividades bajo su supervisión.

   h. Asesora al secretario de Educación sobre asuntos administrativos, técnicos y programáticos relacionados con su trabajo.

   i. Establece y mantiene estándares de ejecución para la medición cuantitativa y cualitativa de las actividades.

   j. Asegura el cumplimiento de las leyes, reglamentos, normas y procedimientos federales

y estatales aplicables a las funciones bajo su responsabilidad.

k. Prepara y provee al secretario informes de progreso, de resultados y estadísticos.

l. Somete recomendaciones para el diseño de planes estratégicos y desarrolla planes de acción a tono con la misión y política pública establecida.

m. Representa al secretario de Educación en todos los asuntos oficiales que este le requiera.

n. Realiza otras tareas afines requeridas que sean necesarias para el buen funcionamiento de la Agencia.

5. Para el año escolar 2021-2022, el DEPR implementó el Plan de Trabajo para reconocer y distinguir a maestros y directores escolares por su excelencia, mediante la iniciativa "*Brilla la Comunidad Escolar*". En dicha iniciativa, se establecieron premios en metálico para los finalistas y ganadores de la distinción a maestro y director del año.

6. El Plan de Trabajo fue propuesto por el Dr. Guillermo R. López Díaz, subsecretario de Asuntos Académicos y Programáticos, y por el Sr. Milton Rosas Gaud, ayudante del secretario del DEPR. En dicho plan se incluyeron las rúbricas de evaluación para la presentación en *PowerPoint* de los candidatos al reconocimiento de maestro y director del año 2021-2022.

7. El 4 de abril de 2022, el doctor López Díaz presentó el Plan de Trabajo ante la Secretaría Auxiliar de Asuntos Federales (SAAF) del DEPR y solicitó $76,406.00, de fondos federales del Programa *ESSER*, para cubrir los premios en metálico para todos los ganadores. Lo anterior, con el propósito de incentivar y reconocer la trayectoria y la excelencia del magisterio y el liderazgo en las escuelas.

8. El DEPR estableció en el Plan de Trabajo los distintos premios en metálico, los cuales se concederían de la siguiente forma:

a. En la primera etapa a nivel regional, se seleccionarían a 14 maestros y 14 directores entre todos los participantes.

b. En la segunda etapa, se seleccionarían a 7 maestros y 7 directores que pasarían a la tercera etapa. Los maestros y directores que no fueran seleccionados para la tercera etapa serían reconocidos con un premio de $2,000.00 para cada uno.

9. Los objetivos reconocidos en el Plan de Trabajo para la solicitud de fondos son:

   a. Reconocer el desempeño eficiente de los docentes y de los directores escolares como factor clave y determinante para el éxito académico de los estudiantes.

   b. Incentivar a los docentes que, de modo sobresaliente, contribuyeron a que los estudiantes que sufrieron rezagos académicos, como efecto directo de enfrentar la pandemia, se recuperen.

   c. Incentivar a los líderes educativos que se destacaron durante este período pandémico para implementar los protocolos del Departamento de Salud que permitiera garantizar un clima escolar donde los empleados y estudiantes se sintieran seguros.

   d. Reclutar y retener el magisterio y líderes educativos en nuestro sistema y que sirvan de modelo a sus pares.

10. En el Plan de Trabajo se contempló el siguiente plan programático y administrativo:

| Objetivo | Persona o área responsable | Estrategia, plan y logística para la ejecución de cada objetivo |
|---|---|---|
| 1. […] | | |
| 2. Una vez se haya recibido la aprobación del plan se procederá a emitir un comunicado oficial para anunciar la convocatoria para la participación del premio maestro y director del año | Subsecretaría para Asuntos Académicos y Programáticos | Se emite comunicado de convocatoria con las reglas a seguir incluyendo la línea de tiempo para cumplir con todas las etapas. |
| 3. Maestros y Directores de auto nominan | Maestros y Directores | Se reciben de forma electrónica la nominación de los participantes |

| 4. Una vez cerrado el proceso de nominación, la SAAP informará a las regiones de los candidatos que serán evaluados a ese nivel. | Subsecretaría para Asuntos Académicos y Programáticos | La SAP procede a informar a los Superintendentes Regionales los participantes que fueron nominados. |
|---|---|---|
| 5. Evaluar al 100% de los nominados y hacer la selección | Nivel Regional | Se procede a evaluar los criterios basados en una rúbrica y seleccionar los candidatos. |
| 6. Anunciar los candidatos seleccionados | Nivel Regional | Nivel Regional informará a nivel central y a los candidatos de la selección. |
| 7. Evaluación | Nivel Central y Selección | Nivel Central evalúa y selecciona a los finalistas y semifinalistas. |

11.     En el Plan de Trabajo se estableció que los superintendentes de las Oficinas Regionales Educativas (ORE) y un jurado serían responsables de la evaluación a nivel regional y, a nivel central, estaría a cargo de un jurado.

12.     El entonces secretario del DEPR, licenciado Ramos Parés, delegó en la Sra. Wanda L. Álvarez Montero, directora ejecutiva I de la Unidad de Remedio Provisional, la coordinación del evento para la selección del maestro y director del año 2021-2022, en representación de la agencia. La señora Álvarez Montero fue la designada y encargada en organizar la iniciativa para la selección del maestro y director del año desde el 2018.

13.     El 4 de abril de 2022, el DEPR publicó el memorando *Selección de Maestro y Director del Año* para el 2021-2022, en el cual explicó el propósito de la iniciativa e invitó a los interesados a someter su nominación. El DEPR divulgó los requisitos de los candidatos, la forma de evaluación, las fechas de las etapas del proceso y las rúbricas de evaluación.

14. El 18 de abril de 2022, la señora Álvarez Montero informó a los superintendentes regionales, mediante correo electrónico, sobre las nominaciones para maestro y director del año y los detalles importantes del evento. Así, también, exhortó a los superintendentes a promover su plan de trabajo para impulsar las nominaciones en sus regiones.

15. El 19 de abril de 2022, el DEPR publicó, nuevamente todo lo relacionado al proceso de selección de maestro y director del año 2021-2022, mediante el memorando *Enmienda de fecha para la Selección de Maestro y Director del Año*.

16. Los requisitos establecidos en los memorandos para la nominación para maestro del año fueron los siguientes:

a. Ser un maestro a tiempo completo, certificado y activo en alguna de las escuelas del DEPR.

b. Evidenciar una carga mínima de cuatro grupos al día para ser elegibles.

c. Mínimo de 5 años de experiencia como maestro en el DEPR.

d. Cumplir con el horario establecido y asistencia regular (no es aceptado un patrón de ausencias y tardanzas).

e. No debe tener querellas radicadas en la Oficina de División Legal del DEPR o tener alguna investigación en proceso.

f. No tener acciones disciplinarias activas en la oficina de Recursos Humanos.

17. El evento se divulgó mediante las comunicaciones oficiales que llegan a los correos electrónicos de todo el personal que labora en el DEPR. También, se publicó en las redes sociales del DEPR y la PREI y mediante reuniones directas con los superintendentes regionales que se coordinaban por conducto de la Sra. Wendy Colón, quien servía de enlace entre los superintendentes regionales y el nivel central del DEPR.

18. El 25 de abril de 2022, el Sr. Douglas J. Meléndez Cruz, coordinador del Programa de Reinicio, Recuperación y Fondos Especiales, adscritos a la SAAS del DEPR, aprobó la solicitud de fondos para la iniciativa de reconocimiento de maestros y directores de escuela. En consecuencia, asignó un presupuesto de $76,406.00 del Programa *ESSER*, que fue destinado para sufragar los premios en metálico para los finalistas y ganadores del reconocimiento a maestro y director del año 2021-2022.

19. De conformidad con el proceso publicado, los maestros interesados se autonominaron y completaron la plantilla en *PowerPoint* que requería que destacaran su perfil, logros, contribución a la profesión, rezago académico y educación especial, impacto comunitario, sus proyectos, liderazgo e iniciativas, uso de la tecnología para innovar en la enseñanza, inteligencia emocional para mejorar el ambiente educativo y la resiliencia. Los maestros debían incluir en la plantilla un plan académico implantado que contribuyó a aumentar el aprovechamiento académico y bienestar del estudiante.

20. Los superintendentes de las regiones educativas del DEPR seleccionaron, mediante un comité evaluador, a dos finalistas de su región para la distinción de maestro del año 2021-2022.

21. El comité a nivel regional utilizó una rúbrica para evaluar las presentaciones de los participantes, en *PowerPoint*, a la distinción de maestro del año.

22. Los maestros seleccionados y finalistas en sus respectivas regiones educativas fueron los siguientes:

| Región Educativa | Maestros-Candidatos participantes |
|---|---|
| San Juan | Blanca Luz Morales Ramos <br> Oscar Centeno Colón |
| Ponce | Jonathan Plaza Plaza <br> Margie Gilormini Aguilar |
| Mayagüez | Odalys González González <br> Edwin Figueroa Acevedo |
| Arecibo | Lisandra De Jesús Fernández <br> Lumarie Santo Domingo Rodríguez |
| Humacao | Rosalba Serrano Rodríguez <br> Wilma Moctezuma Santana |
| Caguas | Odette Cuadros Ramírez <br> Wilnelia Rosario Monserrate |
| Bayamón | Bryan M. Rivera Medina <br> Vivian E. Collazo Ayala |

23. Para el evento *Brilla la comunidad escolar* del 2021-2022, la señora Álvarez Montero seleccionó a los integrantes de los dos paneles de jurado a nivel central, uno para la selección del maestro del año y otro para la selección del director del año.

24.     Dentro de la composición del jurado para seleccionar al maestro del año, la señora Álvarez Montero seleccionó a un abogado, para la transparencia y certificación, y a un profesional académico externo a la agencia, con experiencia y bagaje educativo, para asegurar la objetividad del proceso en la selección del ganador. El jurado estaba compuesto por seis miembros, de los cuales cinco laboran para el DEPR y una integrante externa a la agencia.

25.     El jurado a nivel central para la selección del maestro del año 2021-2022 estaba compuesto por las siguientes personas:

   a. Lcdo. Félix A. Pérez Rivera, director de la Oficina de Política Pública del DEPR;

   b. Dr. Jorge L. Acosta Irizarry, director ejecutivo de la docencia del DEPR;

   c. Prof. Kenny Bermúdez Reyes, ayudante especial del subsecretario de Asuntos Académicos del DEPR;

   d. Dra. Amarilis Caro Caro, gerente de operaciones del DEPR;

   e. Prof. Jessica Díaz Vázquez, secretaria auxiliar de Educación Especial interina del DEPR; y

   f. Dra. Enid Cartagena Villanueva, representante de EDP College.

26.     La organización del evento incluyó la coordinación del almuerzo para los miembros del jurado para que estos no salieran de las facilidades ni se expusieran a incidentes que pudieran afectar el proceso de evaluación y selección de los candidatos.

27.     El 10 de mayo de 2022, el jurado a nivel central realizó la evaluación y entrevistó a los 14 finalistas para la distinción de maestro del año 2021-2022 en el área de Remedio Provisional del DEPR, en horario de 8:00am a 4:30pm.

28.     La dinámica para realizar las rondas de preguntas a los finalistas fue desarrollada entre todos los miembros del jurado, previo al inicio de las entrevistas.

29.     Para seleccionar el ganador a maestro del año, el jurado evaluó las propuestas presentadas por los candidatos y entrevistó a estos siguiendo la rúbrica de evaluación oral establecida.

30.     La rúbrica de evaluación contemplaba las siguientes categorías: contenido, organización de las ideas, exposición, expresión oral, lenguaje no verbal y uso del tiempo. Además, conforme con la rúbrica de evaluación, se otorgaba una puntuación

del uno al cuatro dependiendo de la categoría: (1) insuficiente, (2) aprobado, (3) notable y (4) sobresaliente, para una puntuación máxima de 24 puntos.

31. El 10 de mayo de 2022, el querellado tuvo una reunión semanal con los superintendentes de las siete regiones educativas en la sala de conferencias del secretario del DEPR.

32. Al medio día del 10 de mayo de 2022, el querellado dio instrucciones al Sr. Jorge Miguel Morales Vázquez, ayudante especial II del DEPR, de citar a cuatro de lo seis miembros del jurado, a saber, el licenciado Pérez Rivera, el profesor Bermúdez Reyes, la doctora Caro Caro y el doctor Acosta Irizarry, para una reunión en la sala de conferencias del secretario.

33. Los jurados Díaz Vázquez y Cartagena Villanueva no fueron convocadas a la reunión antes señalada.

34. Cuando el querellado convocó a los cuatro miembros, el 10 de mayo de 2022, ya el jurado había aplicado los criterios de evaluación establecidos en la rúbrica durante las entrevistas realizadas a los finalistas en la mañana de ese día.

35. En la sala de conferencias del secretario se encontraban los superintendentes de las regiones educativas y el querellado cuando se presentaron los miembros del jurado.

36. El querellado estaba en la cadena de mando de los cuatro miembros del jurado citados para la reunión. Estos jurados eran subordinados del querellado y este tenía la facultad de convocarlos e impartirle instrucciones.

37. El señor Sánchez Álvarez les manifestó a los cuatro miembros que fueron citados que, siendo mayoría en el jurado, de los catorce candidatos eligieran a una de las siguientes dos personas: Odalys González González o Bryan Rivera Medina. También, les manifestó las preocupaciones de los superintendentes sobre la falta de publicidad, la poca participación y que los seleccionados debían cumplir con la política pública del Gobernador, así como cuáles eran los más idóneos.

38. Luego de la reunión con el querellado, los cuatro jurados acordaron hacer caso omiso a lo ocurrido y continuar con el proceso bajo las mismas condiciones seguidas durante el curso de la mañana.

39. Los jurados le expresaron a la señora Álvarez Montero que el querellado los había convocado para instruirles que el candidato que debía prevalecer como maestro del año 2021-2022 debía ser escogido

entre el señor Rivera Medina y la señora González González.

40. La señora Álvarez Montero llamó al entonces secretario del DEPR, licenciado Ramos Parés, a quien le manifestó que los procesos seguirían su curso, según establecido, y este así lo avaló e instruyó, específicamente, que los procesos debían continuar según se realizaban antes de la reunión con el señor Sánchez Álvarez.

41. La señora Álvarez Montero habló individualmente con los jurados que se reunieron con el querellado y les manifestó el aval del licenciado Ramos Parés de continuar con los procesos según establecidos, sin acatar ninguna otra consideración.

42. A la jurado Caro Caro le ofendió la instrucción del querellado de seleccionar entre el señor Rivera Medina y la señora González González, y así se lo comunicó al licenciado Ramos Parés mediante mensaje de texto. También, le expresó haber realizado evaluaciones objetivas de los candidatos que habían sido entrevistados, sin mirar criterios como colores, amigos conocidos o regiones, sino con objetividad.

43. Los cuatro jurados manifestaron en sus declaraciones juradas sentirse incómodos, sorprendidos e indignados con la intervención del querellado, la cual percibieron como una fuera de lugar.

44. Finalizadas las entrevistas, el jurado seleccionó como ganador del premio de Maestro del Año 2021-2022 al Sr. Jonathan Plaza Plaza, quien recibió el premio de $5,000.00. Así, también, seleccionaron a los primeros y segundos finalistas de cada región, los cuales recibieron los premios en metálico de la siguiente manera:

| Región Educativa | Maestros | Posición | Cantidad |
|---|---|---|---|
| San Juan | Blanca Luz Morales Ramos | #1 | $3,000.00 |
| | Oscar Centeno Colón | #2 | $2,000.00 |
| Ponce | Jonathan Plaza Plaza | Ganador | $5,000.00 |
| | Margie Gilormini Aguilar | #2 | $2,000.00 |
| Mayagüez | Odalys González González | #1 | $3,000.00 |
| | Edwin Figueroa Acevedo | #2 | $2,000.00 |
| Arecibo | Lisandra De Jesús Fernández | #2 | $2,000.00 |
| | Lumarie Santo Domingo Rodríguez | #1 | $3,000.00 |
| Humacao | Rosalba Serrano Rodríguez | #2 | $2,000.00 |
| | Wilma Moctezuma Santana | #1 | $3,000.00 |
| Caguas | Odette Cuadros Ramírez | #2 | $2,000.00 |
| | Wilnelia Rosario Monserrate | #1 | $3,000.00 |
| Bayamón | Bryan M. Rivera Medina | #1 | $3,000.00 |
| | Vivian E. Collazo Ayala | #2 | $2,000.00 |

45. Culminado el proceso de entrevistas, ese mismo 10 de mayo de 2022, la señora Álvarez Montero y los miembros del jurado, a excepción de la doctora Cartagena Villanueva, fueron convocados a la oficina del Lcdo. Nolan Portalatín Cepeda, director de Asuntos Legales y Política Pública en el DEPR, ante quien prestaron sus respectivas declaraciones juradas.

46. La señora Álvarez Montero y los miembros del jurado, a excepción del licenciado Pérez Rivera, redactaron su declaración en un espacio libre de intervenciones y separado de la oficina del licenciado Portalatín Cepeda.

47. La Unidad Investigativa de la División Legal del DEPR comenzó una investigación sobre la intervención del querellado con el jurado encargado de evaluar a los candidatos y seleccionar al maestro del año 2021-2022.

48. La intervención del querellado con el jurado fue objeto de difusión mediática, previo al día de la ceremonia de premiación, a través de varios medios del país en las siguientes instancias:

a. El 17 de mayo de 2022, *NotiUno 630* publicó en la red social de *Facebook* una nota intitulada *Pierluisi deja en manos del secretario [de] Educación puesto [de] confianza de Héctor Joaquín Sánchez*.

b. El 18 de mayo de 2022, el periódico *El Nuevo Día* publicó en su página web el artículo de prensa intitulado *El subsecretario asociado del Departamento de Educación fue removido por intromisión política en la agencia*, en el cual se reseñó que "H[é]ctor Joaquín Sánchez pretendió influir en la evaluación de los maestros a ser reconocidos en una ceremonia de premiación, lo cual se había delegado en un jurado".

c. El 19 de mayo de 2022, el periódico *El Vocero* publicó en su página web el artículo de prensa intitulado *Héctor Joaquín Sánchez queda fuera de Educación y el secretario le quita la confianza.*

d. El 19 de mayo de 2022, *Noticentro por WAPA* publicó en la red social Facebook una nota intitulada *Subsecretario de Educación fue removido por querer beneficiar a maestros PNP, según investigación.*

49. También fue reseñado en distintos medios noticiosos que el querellado fue destituido como subsecretario asociado del DEPR.

50. La publicación en los medios sobre la intervención del querellado con el jurado generó

comentarios de la ciudadanía como, por ejemplo, los siguientes:

a. "Felicito al Secretario de Educación por tener la valentía de proteger los mejores intereses de los maestros y los estudiantes".

b. "No se abochorna ni él ni el gobernador con sus expresiones. Felicito al secretario porque cosas como esas es que el Departamento está bien politizado y no estimula a los educadores".

c. "[…] es maestro de profesión que gran ejemplo para nuestros estudiantes por eso los niños y adolescentes ven eso como bueno un país sin educación correcta y corrupción es un país que no progresa".

d. "Despolitizar el DE es un hueso duro de roer para cualquier secretario. Se tiene que comenzar con los puestos de confianza, pero no se puede quedar ahí, tiene que seguir a todos los niveles".

e. "En educación no debe existir la política, solo el bienestar de los estudiantes y un ambiente laboral positivo. Cuando el DE entienda eso mejorará la educación".

f. "Otro que esperaba su recompensa por su trabajo para el "partido" y su devoción a su jefe político. Es que no tienen vergüenza. Después de tantos casos de corrupción que han salido a la luz pública, ellos continúan su actividad de corrupción "business as usual" […]".

g. "Hay que sacar a los políticos de Educación".

h. "Basuras como estas son las que desacreditan el departamento de educación. Lo triste es que no son los únicos ni lo serán en el futuro".

i. "Si sacaran a todos los que están por ahí por política se quedan sin departamento".

51. El 19 de mayo de 2022, se celebró la ceremonia de premiación del Maestro y Director del Año 2021-2022 en las facilidades de WIPR, la cual fue televisada.

52. Con respeto a las publicaciones de la prensa, la señora Álvarez Montero sostuvo una comunicación telefónica con la doctora Cartagena Villanueva, jurado externa del DEPR, para atender sus preocupaciones en cuanto a las preguntas que pudiera hacerle la prensa durante la ceremonia de premiación y dialogar sobre lo ocurrido el 10 de mayo de 2022.

53. La jurado Caro Caro no participó de la ceremonia de premiación a causa de la publicación

de la prensa porque le preocupaba que se percibiera al jurado como comprado a que la selección del ganador fue producto de la intervención del querellado. También, percibió que la imagen y las funciones ejercidas como jurado y del proceso de selección del maestro del año 2021-2022 que siguió el DEPR se puso en duda por la intervención de este.

54. La doctora Cartagena Villanueva, luego de leer las publicaciones de prensa y los comentarios sobre el evento, percibió que se puso en duda la validez de los procesos seguidos y que se afectó la imagen del DEPR, lo que repercutía en ella como miembro del jurado. Además, consideró que la actuación del querellado, en indicarles a los cuatro miembros del jurado a quiénes debían favorecer con su votación, fue una intervención inapropiada de este.

55. El DEPR tomó medidas de seguridad para evitar que los medios de comunicación y representantes de la prensa pasaran a la ceremonia de premiación, ante la divulgación en la prensa sobre los hechos del 10 de mayo de 2022.

56. La señora Álvarez Montero sostuvo que la intervención del querellado con los cuatro miembros del jurado para sugerirles que escogieran al ganador entre los dos candidatos que mencionó y su difusión pública incidió en que mermara la participación de maestros en años posteriores.

57. El señor Sánchez Álvarez no estaba encargado del proceso para la selección del maestro y director del año 2021-2022.

58. El 30 de enero de 2023, el Lcdo. Domingo Emanuelli Hernández, entonces secretario del Departamento de Justicia, informó al querellado que la División de Integridad Pública y Oficina de Asuntos del Consumidor (DIPAC) del Departamento de Justicia, al concluir la investigación preliminar, recomendó no designar a un Fiscal Especial Independiente (FEI) en el caso núm. 2022-31-102-00070 debido a que la intervención del señor Sánchez Álvarez con algunos miembros del jurado de la premiación al maestro del año no constituyó delito.

59. El 4 de abril de 2023, el PFEI emitió Resolución en el caso núm. NA-FEI-2023-0011, en la que se archivó la investigación relacionada con el señor Sánchez Álvarez al concluir que no existe causa suficiente para creer que el querellado incurrió en conducta de naturaleza penal para la designación de un FEI.

60. El 15 de abril de 2024, el DEPR cerró y archivó la investigación administrativa OFI-2022-0000040 por adolecer de un requisito procesal indispensable conforme al Reglamento Núm. 7565,

*Reglamento de Medidas Correctivas y Acciones Disciplinarias* (Reglamento de Medidas Correctivas) del 8 de septiembre de 2008 al no presentarse la querella o referido por el licenciado Ramos Parés, entonces secretario del DEPR y supervisor inmediato del querellado.

A tenor con las determinaciones, la Oficial Examinadora le recomendó a la OEG encontrar al Recurrente incurso en violación a los incisos (b) y (s) del artículo 4.2 de la Ley de Ética Gubernamental ("Ley de Ética")[12]. El 11 de julio de 2025, la OEG emitió su *Resolución*[13] y determinó que el Sr. Sánchez incurrió en violación a los incisos (b) y (s) del Artículo 4.2 de la Ley de Ética y le impuso una multa administrativa de $2,500.00 por cada infracción, para un total de $5,000.00.

Según surge de la Resolución en Reconsideración, el 30 de julio de 2025, el Recurrente presentó una *Solicitud de Reconsideración Conforme a la Regla 7.19(B)*[14]. El 14 de agosto de 2025, la OEG emitió una *Resolución en Reconsideración*[15] denegando la solicitud de reconsideración. Ante tal determinación, el 15 de septiembre de 2025, el Sr. Sánchez acudió ante nos mediante recurso de revisión judicial e hizo los siguientes señalamientos de error:

> **ERRÓ LA OFICINA DE ÉTICA GUBERNAMENTAL AL NO FUNDAMENTAR SU DETERMINACIÓN EN PRUEBA CLARA, ROBUSTA Y CONVINCENTE QUE SURGIERA DEL EXPEDIENTE ADMINISTRATIVO EVALUADO EN SU TOTALIDAD.**

> **ERRÓ LA OFICINA DE ÉTICA GUBERNAMENTAL AL CONCLUIR QUE QUEDÓ DEMOSTRADO CON PRUEBA CLARA, ROBUSTA Y CONVINCENTE QUE SE CONFIGURARON CADA UNO DE LOS ELEMENTOS DE LAS VIOLACIONES IMPUTADAS AL SEÑOR SÁNCHEZ**

---

[12] Ley Núm. 1 de 3 de enero de 2012, según enmendada, conocida como *Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico*, 3 LPRA § 1854 et seq.
[13] Véase Apéndice del recurso de revisión judicial, Entrada #2.
[14] Véase Expediente de Primera Instancia, Entrada #3, pág. 6.
[15] Véase recurso de revisión judicial, Anejo #3.

**ÁLVAREZ BAJO LOS INCISOS (B) Y (S) DEL ARTÍCULO 4.2 LA LOOEG.**

**ERRÓ LA OFICINA DE ÉTICA GUBERNAMENTAL AL INTERPRETAR Y APLICAR INCORRECTAMENTE EL INCISO (B) ARTÍCULO 4.2 DE LA LOOEG, AL EXTENDER EL CONCEPTO DE "PERSONA PRIVADA" MÁS ALLÁ DE LO DISPUESTO EN LA LEY, Y SIN ACREDITAR MEDIANTE PRUEBA CLARA, ROBUSTA Y CONVINCENTE UN BENEFICIO INDEBIDO.**

**ERRÓ LA OFICINA DE ÉTICA GUBERNAMENTAL AL CONCLUIR QUE EL SEÑOR SÁNCHEZ ÁLVAREZ INCURRIÓ EN VIOLACIÓN AL INCISO (S) DEL ARTÍCULO 4.2 DE LA LOOEG SIN QUE MEDIARA PRUEBA CLARA, ROBUSTA Y CONVINCENTE QUE A SU VEZ SUPERARA Y DESCARTARA TODOS LOS PLANTEAMIENTOS BASADOS EN CONJETURAS Y EN RELATOS DE TERCEROS, Y AL BASAR SU DETERMINACIÓN, EN CAMBIO, EN RECORTES DE PRENSA, REACCIONES EN PUBLICACIONES MEDIÁTICAS Y CONJETURAS O APRECIACIONES PERSONALES, INSUFICIENTES PARA SOSTENER LA IMPUTACIÓN CONFORME AL ESTÁNDAR JURÍDICO APLICABLE.**

El 24 de octubre de 2025, la OEG presentó su alegato en oposición. En síntesis, alega que se pudo probar con prueba clara, robusta y convincente que el Recurrente violó la LOOEG al utilizar sus facultades como subsecretario asociado del DEPR para obtener una ventaja indebida para dos participantes en la premiación "*Maestro del Año 2021-2022*".

-II-

## A. Deferencia administrativa

La *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico*[16] ("LPAUG") autoriza la revisión judicial de las decisiones de las agencias administrativas. Es un principio establecido que los tribunales apelativos debemos otorgar amplia deferencia a las decisiones emitidas por las agencias administrativas, debido a que estas cuentan con vasta experiencia y pericia para atender los asuntos que le

---

[16] Ley Núm. 38 de 30 de junio de 2017, según enmendada.

han sido delegados por la Asamblea Legislativa.[17] Por lo tanto, las determinaciones de las agencias suponen una presunción de legalidad y corrección que a los tribunales nos corresponde respetar, mientras la parte que las impugne no presente prueba suficiente para derrotarlas.[18] Sin embargo, dicha norma no es absoluta. A tales efectos, nuestro más alto foro ha enfatizado que no podemos imprimirle un sello de corrección a una determinación, so pretexto de deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho. Nuestro Tribunal Supremo resumió las normas básicas en torno al alcance de la revisión judicial de la siguiente forma:

> [L]os tribunales deben deferencia a las decisiones de una agencia administrativa, pero ésta [sic] cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos, procede que se valide la interpretación que realizó la agencia administrativa recurrida.[19]

El criterio rector bajo el cual los tribunales deben revisar las decisiones administrativas es el

---

[17] *Hernández Feliciano v. Mun. de Quebradillas*, 211 DPR 99 (2023); *OEG v. Martínez Giraud*, 210 DPR 79 (2022); *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018).
[18] *Rolón Martínez v. Supte. Policía, supra; Batista, Nobbe* v. *Jta. Directores*, 185 DPR 206, 215 (2012).
[19] *Super Asphalt v. AFI y otro, supra*, pág. 819.

criterio de razonabilidad.[20] Bajo este criterio, la revisión judicial se limita a dirimir si la agencia actuó de forma arbitraria o ilegal, o de manera tan irrazonable que su actuación constituya un abuso de discreción.[21] La intervención del tribunal se limita a tres áreas, a saber: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si las conclusiones de derecho del ente administrativo fueron correctas.[22] Nuestro máximo foro ha expresado que esta intervención *"debe ocurrir cuando la decisión administrativa no se fundamente en evidencia sustancial o cuando la agencia se equivoque en la aplicación de la ley."*[23] Siendo así, aquellas determinaciones de hechos formuladas por el ente administrativo deberán sostenerse cuando estén basadas en evidencia sustancial que surja del expediente administrativo considerado en su totalidad.[24]

Por otro lado, las determinaciones de derecho pueden ser revisadas en su totalidad.[25] No obstante, los tribunales deberán darles peso y deferencia a las interpretaciones que la agencia realice de aquellas leyes particulares que administra.[26] Ahora bien,

---

[20] *OEG v. Martínez Giraud*, *supra*; *Super Asphalt v. AFI y otro*, *supra*, pág. 820; *Graciani Rodríguez v. Garaje Isla Verde*, *supra*, pág. 127.
[21] *OEG v. Martínez Giraud, supra.*
[22] *Torres Rivera v. Policía de PR*, 196 DPR 606, 626-627; *Batista, Nobbe v. Jta. Directores*, *supra*, pág. 217.
[23] *Rolón Martínez v. Supte. Policía*, *supra*, pág. 36.
[24] *Íd.*; *OEG v. Martínez Giraud*, *supra*; *Super Asphalt v. AFI y otro*, *supra*.
[25] *Véase* Sección 4.5 de la LPAUG, 3 LPRA § 9675; *Rolón Martínez v. Supte. Policía*, *supra*, pág. 36; *Torres Rivera v. Policía de PR*, *supra*, pág. 627.
[26] *Torres Rivera v. Policía de PR, supra,* pág. 627.

nuestro más alto foro ha establecido que la deferencia que le deben los tribunales a la interpretación que haga el ente administrativo sobre aquellas leyes y reglamentos que le corresponde poner en vigor, cede si la agencia: (1) erró al aplicar la ley (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales.[27]

Finalmente, el Tribunal Supremo ha expresado que, conforme a lo anterior, el criterio administrativo no podrá prevalecer en aquellas instancias donde la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrario al propósito para el cual fue aprobada la legislación y la política pública que promueve. Así, "*la deferencia judicial al expertise administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia.*"[28]

**B. Ley Orgánica de la Oficina de Ética Gubernamental**

La Ley Orgánica de la Oficina de Ética Gubernamental[29] ("Ley de Ética") tiene como propósito establecer un servicio público íntegro que mantenga la confianza en sus instituciones y asegure la transparencia en las funciones oficiales.[30] A fin de reafirmar su carácter preventivo y correctivo, la OEG tiene la facultad de imponer sanciones a los infractores de sus disposiciones. Así, el Artículo 4.7 dispone que toda persona que viole las disposiciones de la Ley de Ética y todo reglamento u orden promulgada

---

[27] *Íd.,* págs. 627-628; *OEG v. Martínez Giraud*, *supra*, pág. 90.
[28] *OEG v. Martínez Giraud*, *supra*, pág. 91.
[29] Ley Núm. 1 de 3 de enero de 2012, según enmendada.
[30] *Oficina de Ética Gubernamental v. Manuel B. Martínez Giraud*, 210 DPR 79, 91 (2022).

por virtud de la referida ley será castigada con una multa administrativa que no excederá de $20,000.00 por cada violación.[31] Respecto a la controversia que nos ocupa, el Artículo 4.2 de la mencionada ley establece una serie de prohibiciones éticas de carácter general aplicables a los servidores y ex servidores públicos de la Rama Ejecutiva. Particularmente, el inciso (b) dispone lo siguiente:

> Un servidor público no puede utilizar los deberes y las facultades de su cargo ni la propiedad o los fondos públicos para obtener, directa o indirectamente, para él o para una persona privada o negocio, cualquier beneficio que no esté permitido por ley[32].

Por su parte, el inciso (s) del referido artículo lee como sigue: "*Un servidor público no puede llevar a cabo una acción que ponga en duda la imparcialidad e integridad de la función gubernamental*"[33]. Según nuestro más alto foro, la referida disposición penaliza el hecho de que un servidor público lleve a cabo acciones que pongan en duda la imparcialidad e integridad de la función gubernamental.[34] Cónsono con lo anterior, el Tribunal Supremo ha señalado que esta norma va dirigida a sancionar aquellas acciones que aparenten perjudicar, o de alguna manera estropear la confianza del público en sus instituciones gubernamentales. Sobre este particular, el máximo foro indicó:

> Ahora bien, **no cualquier conducta** que aparente representar un conflicto ético o una incompatibilidad con las funciones gubernamentales de un empleado

---

[31] 3 LPRA § 1857f.
[32] Artículo 4.2 de *La Ley de Ética Gubernamental*, *supra*, 3 LPRA § 1857a.
[33] *Íd.*
[34] *O.E.G. v. Martínez Giraud*, supra.

público, por sí sola, debe ser considerada como una infracción punible bajo esta disposición. Esto es así, pues la amplitud con la que puede ser interpretada una prohibición de este tipo no puede representar, en lo absoluto, una carta blanca para que la mínima percepción sea procesada y castigada, sin tomar en consideración la totalidad de la prueba y sin eliminar el peso de factores externos que puedan incidir directamente sobre el asunto.[35]

Por último, es menester señalar que el Tribunal Supremo estableció que cuando se cuestione el comportamiento ético de un funcionario público, así sea la simple apariencia de imparcialidad o deshonestidad, el cargo debe quedar establecido mediante **prueba clara, robusta y convincente** que, a su vez, supere y descarte todos los planteamientos basados en conjeturas y en relatos de terceros. Dicha conclusión fue alcanzada tomando en consideración que la naturaleza del procedimiento es una acusatoria, en la que el empleado público se encuentra sujeto a ser castigado con una multa sustancial o con el despido de su empleo.

-III-

En el presente caso, el Recurrente nos solicita la revocación de la determinación emitida por la OEG, tras alegar que la Agencia no estableció la violación al inciso (b) y (s) del Artículo 4.2 de la Ley de Ética mediante prueba clara, robusta y convincente.

Primeramente, debemos atender el señalamiento que hizo la OEG referente al inciso (b). Dicho inciso prohíbe que un servidor público utilice los deberes y facultades de su cargo, así como la propiedad o fondos

---

[35] *Íd.* Énfasis suplido.

públicos para obtener para él, para una persona privada o para un negocio, cualquier beneficio que no esté permitido por ley. Las alegaciones que hace la OEG contra el Recurrente son referentes a la iniciativa llamada "*Brilla la Comunidad Escolar*" para reconocer al maestro y director del año para el 2021-2022. Según, la Agencia, el Recurrente intentó favorecer a unos candidatos sobre otros. Es decir, el alegado beneficio iba dirigido a servidores públicos del sistema de enseñanza, no a una persona privada. Por lo tanto, concluimos que la aplicación del Artículo 4.2 (b) al caso de autos, carece de méritos.

Ahora, pasemos a evaluar el inciso (s) del mencionado artículo. En el caso de *OEG v. Martínez Giraud*, *supra*, nuestro más alto foro precisó las consideraciones que debemos observar al examinar una imputación al amparo del Artículo 4.2 (s) de la Ley de Ética. A tales efectos, el Tribunal Supremo de Puerto Rico destacó que "*cuando se cuestione el comportamiento ético de un funcionario público, así sea la simple apariencia de imparcialidad o deshonestidad, el cargo debe quedar establecido mediante prueba clara, robusta y convincente que, a su vez, supere y descarte todos los planteamientos basados en conjeturas y en relatos de terceros*"[36]. Así explicó nuestro más alto foro el *quantum* de prueba aplicable a los procesos cuasi-penales ante la OEG.

La Oficial Examinadora basó su Informe en tres elementos principales, a saber: (1) artículos de prensa, (2) comentarios y reacciones de ciudadanos en

---

[36] *OEG v. Martínez Giraud, supra*, pág. 97.

las redes sociales y (3) declaraciones juradas de algunos miembros del jurado. Ahora bien, nos toca evaluar tales fundamentos a la luz del estándar requerido en controversias como la de autos. Veamos.

La determinación de hecho #48 hace referencia a cuatro (4) publicaciones que hicieron diferentes medios de prensa del país sobre la alegada violación del Recurrente a la Ley de Ética. Ahora bien, es menester señalar que lo publicado en dichos medios no se trataba de hechos probados, toda vez que había una investigación en curso. No fue hasta el 30 de enero de 2023 que el Hon. Domingo Emanuelli Hernández, el entonces Secretario del Departamento de Justicia de Puerto Rico, le remitió al Panel Sobre el Fiscal Especial Independiente (PFEI) un informe de investigación preliminar. Por lo tanto, la prueba para demostrar un acto sancionable como lo es una violación ética no puede descansar en información que se encontraba siendo investigada. Cabe señalar que el resultado de dicha investigación consta en la Resolución emitida por el PFEI el 4 de abril de 2023. En síntesis, y en lo concerniente a la controversia ante nos, el informe detalló que el comentario del Recurrente indicando que las personas a ser elegidas fueran afines con la política pública del gobernador, no se traduce en militancia a un partido político, sino a la gobernanza. Sobre este particular, hace referencia a la diferencia que existe entre "política pública" y "política partidista" y explica que la política pública es el conjunto de objetivos, decisiones y acciones que lleva a cabo un gobierno para solucionar los problemas

que, tanto los ciudadanos como el gobierno, consideran prioritarios.[37] Finalmente, la Resolución señala que el asunto político-partidista fue una interpretación que le dieron algunos de los presentes en la reunión. A tenor con lo anterior, el entonces Secretario del Departamento de Justicia concluyó que no se configuró el delito contemplado en el Artículo 4.2 (b) de la Ley de Ética. Coincidimos con dicho análisis. Estar alineado a la política pública de un gobernador no es sinónimo de pertenecer a su partido.

El segundo elemento que utiliza la OEG para fundamentar la violación a la Ley de Ética son los comentarios y reacciones de ciudadanos en las redes sociales. Tal y como indicamos, los artículos que publicaron diversos medios noticiosos se basaron en meras alegaciones y no en hechos probados. Es decir, los comentarios de los ciudadanos se basaron en hechos inciertos. Además, tal y como hemos expresado a lo largo de este escrito, el *quantum* de prueba requerido en casos como el de autos es el de <u>prueba clara, robusta y convincente</u>. La interpretación de algunos ciudadanos sobre ciertas alegaciones en contra del Recurrente no puede ser utilizada como fundamento para sustentar una violación a la Ley de Ética. Este tipo de evidencia no cumple con el estándar requerido por nuestro ordenamiento jurídico.

Finalmente, la OEG fundamentó sus alegaciones en las declaraciones juradas de cuatro miembros del jurado, los cuales indicaron haberse sentido incómodos e indignados con la actuación del Recurrente. Ahora

---

[37] Véase Expediente de Primera Instancia en SUMAC, Entrada #9, Segmento 20, pág. 2.

bien, la percepción de los jurados no demuestra con prueba clara, robusta y convincente que la conducta imputada constituyó una violación a la Ley de Ética. De las propias declaraciones juradas surge que ninguno de los jurados escuchó que el Recurrente haya expresado que el ganador del premio tenía que ser del Partido Nuevo Progresista, sino que debía que estar acorde con la política pública del Gobernador[38]. La interpretación de dicho comentario por algunos miembros del jurado no se puede utilizar como fundamento para concluir que el Recurrente incurrió en una violación ética.

A la luz de los fundamentos esbozados, concluimos que erró la Oficina de Ética Gubernamental al encontrar al Recurrente incurso en violación a los incisos (b) y (s) del Artículo 4.2 de la Ley de Ética Gubernamental y en consecuencia imponerle dos multas administrativas.

-IV-

Por los fundamentos que anteceden, se **_revoca_** la determinación recurrida por no haberse presentado prueba que cumpla con el _quantum_ de prueba requerido, y en su consecuencia, se desestima la Querella presentada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

La juez Aldebol Mora disiente en parte del dictamen de la mayoría. Por un lado, coincide con la mayoría en que no correspondía la imposición de una multa de $2,500.00 por violación al inciso (b) del artículo 4.2 de la Ley de Ética Gubernamental, 3 LPRA sec. 1857a, por no ser este de aplicabilidad a la

---

[38] _Íd._, Segmento 8, pág. 25.

situación de hechos que motiva el presente caso. Sin embargo, en cuanto a la violación al inciso (s) de la referida disposición, disiente del presente dictamen en la medida que la mayoría considera que esta no quedó probada, de conformidad con el estándar de prueba clara, robusta y convincente, aplicable a los casos en que se le impute alguna violación ética a un funcionario público. Por el contrario, la juez Aldebol Mora considera que la prueba evaluada por la Oficina de Ética Gubernamental satisfizo el mencionado estándar y demostró que Héctor Joaquín Sánchez Álvarez incurrió en conducta constitutiva de violación al inciso (s) del artículo 4.2 de la Ley de Ética Gubernamental, *supra*. Por tanto, en lugar de revocar, modificaría la *Resolución* recurrida, a los únicos fines de reducir la penalidad impuesta a una sola multa de $2,500.00.


                    Lcda. Lilia M. Oquendo Solís
                Secretaria del Tribunal de Apelaciones